[No. A046895. First Dist., Div. Two. Mar. 18, 1992.]

CONSUMERS UNION OF U.S., INC., et al., Plaintiffs and Respondents,
v.
ALTA-DENA CERTIFIED DAIRY et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1(a), this opinion is certified for publication with the exception of parts II.B. through II.*I.*

## COUNSEL

Raymond A. Novell for Defendants and Appellants.

John J. Meehan, District Attorney, James W. Mullally, Deputy District Attorney, Gail K. Hillebrand, Turner & Prorby and Elizabeth D. LaPorte for Plaintiffs and Respondents.

Daniel E. Lungren, Attorney General, Herschel T. Elkins, Assistant Attorney General, Michael R. Botwin, Deputy Attorney General, Catherine I. Hanson, John H. Gilman, Hogan & Hartson, Stephan E. Lawton, Thomas N. Bulleit, Jr., and Margaret F. Costella as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**PETERSON, J.**—Appellant Alta-Dena Certified Dairy and its related corporate entities[1] appeal from a civil judgment entered in favor of respondents Consumers Union of U.S., Inc., the American Public Health Association, and

---

[1]Appellants are Alta-Dena Certified Dairy, a limited partnership, now known as Stueve Bros. Farms; Alta-Dena Certified Dairy, Inc.; Stueve's Natural, Inc.; and Alta-Dena Dairy, Inc. Unless otherwise indicated, we will refer to appellants collectively as Alta-Dena.

the People of the State of California on their civil complaints challenging Alta-Dena's advertising practices. In affirming the judgment of the court below, we will hold, in the published portions of this opinion, that a trial court has the authority to order the placement of a warning on a commercial product to remedy the past effects of false advertising and unfair business practices.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Alta-Dena operates what is estimated by some to be the world's largest dairy. Its facilities in California include a large farm near Chino, a calving farm near Oakdale, a creamery in City of Industry, and various trucks and equipment. Some 85 percent or more of Alta-Dena's production is dedicated to supplying pasteurized milk and related pasteurized milk products. The remainder of Alta-Dena's production goes toward supplying raw certified milk and raw certified milk products. The present suit only involves the latter category of Alta-Dena's consumer goods, i.e., its raw certified milk and raw certified milk products. Alta-Dena is the state's largest producer of such products, supplying some 90 percent of the raw certified milk sold in the State of California.

As the name implies, raw certified milk is different from pasteurized milk. "Raw" means that the milk has not been subjected to pasteurization, while the term "certified" means that the milk has been produced under standards similar to those established by the American Association of Medical Milk Commissions. (See Food & Agr. Code, §§ 35861, 35891, 35921 et seq.)

Since the 1950's, Alta-Dena has promoted its raw certified milk and raw certified milk products (hereafter collectively referred to as RCM) as possessing various health and safety attributes. Printed brochures distributed by Alta-Dena touted its RCM as the "safest" and "purest" milk available; "ideal" for infants and a "basic food" for invalids. Other brochures stressed RCM's supposed health benefits over pasteurized milk and suggested that infants as young as two weeks old be fed a formula made from RCM and honey. Radio and television advertisements broadcast in both Northern and Southern California contained similar claims, asserting, for example, that RCM was produced under the "highest" standards and that certification made "pasteurization unnecessary." The cartons in which RCM was sold also contained various advertising claims such as that RCM was "the highest quality milk" and was produced "under the strictest of health standards."

A complaint challenging these advertising practices was filed by Consumers Union and the American Public Health Association (hereafter collectively

Consumers) in the Alameda County Superior Court in the summer of 1985.[2] Consumers alleged Alta-Dena's advertising was false and misleading, in violation of the unfair competition law (Bus. & Prof. Code,[3] § 17200 et seq.) and the false advertising act (§ 17500 et seq.). In addition, Consumers asserted that Alta-Dena had failed to comply with an Alameda County ordinance regulating the sale of RCM. The complaint sought temporary and permanent injunctive relief preventing Alta-Dena from falsely advertising the alleged benefits of its RCM, and requiring it to disclose the dangers associated with RCM's consumption.

A preliminary injunction restraining Alta-Dena's advertising practices was granted in September 1985. Then the following month, the court allowed the Alameda County District Attorney to file a complaint in intervention which substantially tracked the previous complaint which had been filed by Consumers.

A nonjury trial to consider the issues framed by the complaint and complaint in intervention began in October 1988; it continued for 54 days, during which 44 witnesses testified and approximately 800 exhibits covering some 40,000 pages were introduced. The evidence at trial overwhelmingly established that, contrary to the claims made in Alta-Dena's advertisements, RCM: (1) can contain highly dangerous organisms, (2) is less safe than pasteurized milk, (3) does not possess superior health and nutritional benefits, and (4) is not produced under the strictest health standards in the industry. In the pages which follow, we summarize only a portion of the vast array of evidence introduced at trial.

## A. RCM Contains Harmful Bacteria and Can Be Dangerous

Alta-Dena's RCM has frequently been found to contain disease-causing organisms. From 1974 to the time of trial, pathogens were found in Alta-Dena's RCM approximately 250 times by various public and private laboratories. The pathogen found most frequently was a particularly dangerous type of salmonella known as salmonella dublin (hereafter S. dublin). The United States Food and Drug Administration (hereafter FDA) has classified S. dublin as "life threatening." In California, approximately 80 percent of those who become ill with S. dublin are hospitalized and 20 percent die. Unlike less serious forms of salmonella which normally confine themselves to gastrointestinal illness, S. dublin frequently causes severe illness by

[2]A third organization, the California Gray Panthers, also joined as plaintiff in the initial complaint. That organization was subsequently dissolved and its dismissal was entered.

[3]Unless otherwise indicated, all subsequent statutory references are to the Business and Professions Code.

invading the bloodstream and deep-body sites. Since S. dublin mainly infects cows and is killed by heating, it is primarily found in raw milk. Other harmful bacteria isolated from RCM include salmonella St. Paul, brucella (which can cause a serious disease known as brucellosis or undulant fever), listeria monocytogenes, and campylobacter.

The danger posed by the presence of these pathogens in RCM is very real. At trial, Consumers presented numerous examples of previously healthy persons who became ill after drinking Alta-Dena's products. Mary Jo Thomas became ill with S. dublin in November 1984 after consuming Alta-Dena's raw certified milk. Shortly before her illness, a laboratory isolated S. dublin in Alta-Dena's RCM. Drinking the RCM caused an infection which resulted in a life-threatening aneurysm in Ms. Thomas's heart. As a result, Ms. Thomas needed major surgery and must take antibiotics for the rest of her life.

Rosemary McQuinney and her husband, strict vegetarians, began drinking RCM after receiving Alta-Dena's advertising materials at a health food convention in January 1983. After drinking the product for about five weeks, the couple developed high fever, nausea, vomiting, and diarrhea. The code on the container of RCM which they were drinking at the time of their illness indicated that it came from a batch of milk shown by state tests to contain salmonella.

In 1984, a group of kindergarten children visited Alta-Dena's dairy and drank RCM on the tour. Some days later several of the children and the adults who had accompanied them became ill with campylobacter as a result of the RCM they had consumed.

While consuming RCM is hazardous for normally healthy individuals, RCM is especially dangerous to those who have a reduced immunity as a result of illness or medical treatment. The elderly; pregnant women; those with cancer; those with AIDS and related HIV-positive conditions; those taking cortisone, antibiotics, or antacids; diabetics and alcoholics are particularly at risk because very small amounts of disease-causing organisms can make these consumers ill. Combined, these groups represent some 20 percent of the population of California. The AIDS cases are especially poignant since these persons, not realizing the danger of RCM, seek out the product because it is promoted as a health food, only to fall ill from consuming it.

RCM's danger to those whose health is compromised is illustrated by the case of Ronald Warren who contracted S. dublin in July 1984 after his wife fed him Alta-Dena RCM hoping to improve his deteriorating health due to

alcoholism. Mr. Warren died a few weeks later, partly as a result of his S. dublin infection.

Infants too are at a special risk from pathogens contained in RCM because their immune systems are immature and their stomachs lack a needed type of acid. Further, despite Alta-Dena's advertisements suggesting a formula of RCM and honey for infants as young as two weeks, for decades, doctors have recommended against babies drinking unmodified cow's milk because it places an excessive load on their kidneys; while honey is known to cause potentially fatal infant botulism.

One illustration of the danger to infants from RCM is the case of Joshua Hamby, who previously had been fed breast milk and formula but was switched to RCM. Within days, Joshua became ill and was hospitalized with an S. dublin infection caused by his consumption of raw milk.

### B. *RCM Is Less Safe Than Pasteurized Milk*

Despite Alta-Dena's claims to the contrary, RCM is less safe than pasteurized milk. Experts representing both sides at trial agreed that harmful bacteria in milk are killed by proper pasteurization. By contrast, certification, which relies solely on external cleanliness, cannot always eliminate harmful bacteria. Seemingly healthy looking cows known as "mammary shedders" can shed S. dublin from their mammary glands directly into their milk. As one expert stated, "you basically can't scrub the inside of the cow."

The FDA concluded after extensive hearings that "pasteurization, when performed as prescribed . . . , effectively eliminates *S. dublin* as well as numerous other harmful microorganisms." State and federal testing conducted in the 1980's found no salmonella or campylobacter in pasteurized milk in California. Alta-Dena introduced no evidence of illness in California due to pasteurized milk.

### C. *RCM Is Not Nutritionally Superior to Pasteurized Milk*

Alta-Dena claimed its RCM was nutritionally superior to pasteurized milk. Its advertisements contained assertions such as "It is [a] matter of common knowledge that physicians, nutrition specialists and dietitians recommend . . . Raw Certified Milk" or that pasteurization reduces the vitamins in milk. In other advertisements, Alta-Dena claimed that RCM "may provide as much as a 30% increase in calcium absorption" over pasteurized milk.

In fact, experts at trial established that RCM possesses no significant nutritional advantage over pasteurized milk. The FDA concluded after extensive study, "The theoretical health benefits of raw milk have never

withstood scientific scrutiny. . . . FDA concludes that pasteurization does not significantly change the nutritive or immunologic value of milk and that the risks associated with the consumption of raw milk, including certified raw milk, outweigh any alleged health benefits that may arise from consuming raw milk and certified raw milk."

### D. *Alta-Dena's RCM Is Not Produced Under the Strictest Health Standards*

Many of Alta-Dena's advertisements stated that its RCM was produced under stricter bacteriological and health standards than pasteurized milk. Slogans such as "produced under the strictest standards in the industry" were used on many of Alta-Dena's products. Other advertisements noted that the standards for RCM allow for fewer bacteria to be present than in pasteurized milk and, thus, implied that RCM was safer.

In fact, expert testimony at trial established that bacterial standards bear little relation to the safety of milk. The standards to which Alta-Dena referred measure only the total bacteria present in milk; harmful bacteria are not separated from those which are beneficial or benign. Thus, while RCM may possess fewer bacteria, the bacteria which are present can be, and at times are, more dangerous. Contrary to the advertisement's clear implication, the simple fact that fewer bacteria are present in RCM does not mean it is safer.

Further, despite Alta-Dena's assertion that the strictest health standards were followed in producing RCM, Alta-Dena failed to comply with the standards it advertised a significant portion of the time. Records introduced at trial established that Alta-Dena's "finished product" failed to comply with the applicable bacteriological standards at least 20 percent of the time between 1980 and 1988. Alta-Dena's top management was aware that the advertised standards were being exceeded regularly, but did nothing to recall the products or to modify its advertising.

### E. *Remedies Imposed by the Trial Court*

Faced with the overwhelming testimonial and documentary evidence establishing the false and misleading quality of Alta-Dena's advertising, the court employed some unusual remedies. The court issued an injunction permanently enjoining Alta-Dena from making false or misleading claims about the health, safety, or nutritional qualities of its RCM, or from making misleading claims about the health standards under which it was produced. In addition, the court ordered Alta-Dena to disclose the dangers of RCM by

placing a warning on its RCM products for 10 years stating, "WARNING: THIS MILK MAY CONTAIN DANGEROUS BACTERIA. THOSE FACING THE HIGHEST RISK OF DISEASE OR DEATH INCLUDE BABIES, PREGNANT WOMEN, THE ELDERLY, ALCOHOLICS, THOSE WITH CANCER, AIDS OR REDUCED IMMUNITY AND THOSE TAKING CORTISONE, ANTIBIOTICS OR ANTACIDS. QUESTIONS REGARDING THE USE OF RAW CERTIFIED MILK SHOULD BE DIRECTED TO YOUR PHYSICIAN."

The court also ordered Alta-Dena to place a disclosure on all of its advertisements which contain representations concerning the health or nutritional benefits of RCM. For 10 years, such advertisements must bear the following statement, "WARNING: THE FOOD AND DRUG ADMINISTRATION (FDA) HAS DETERMINED (1) THAT THERE IS NO SATISFACTORY SCIENTIFIC PROOF THAT PASTEURIZATION SIGNIFICANTLY REDUCES THE NUTRITIONAL VALUE OF MILK AND (2) THAT THE RISKS ASSOCIATED WITH CONSUMING RAW CERTIFIED MILK OUTWEIGH ANY OF ITS ALLEGED HEALTH BENEFITS."

In addition to the injunction and disclosure statements, the court ordered Alta-Dena to pay the sum of $100,000 as restitution to the California Attorney General's Office. Civil penalties of $23,000 were also imposed. Finally, the court awarded Consumers its attorney fees under Code of Civil Procedure section 1021.5.

After a judgment setting forth these rulings was entered, Alta-Dena filed the present appeal.

## II. DISCUSSION

### A. Authority to Order the Placement of a Warning on Consumer Products to Remedy the Past Effects of False Advertising

■ Alta-Dena first maintains the trial court lacked the authority to order that a warning label be affixed to its consumer products.[4] We disagree.

The trial court based its order on the authority granted to it under California's consumer protection statutes: the unfair competition law (§ 17200 et seq.) and the false advertising act (§ 17500 et seq.). Under the unfair competition law, "unfair or fraudulent business practice[s] and unfair,

---

[4]Although the trial court also ordered that a warning statement be placed on all Alta-Dena's advertisements which contained health and nutritional claims, Alta-Dena does not directly challenge this aspect of the judgment.

deceptive, untrue or misleading advertising" are prohibited. (§ 17200.) The false advertising act prohibits the dissemination in any advertising media of any "statement" concerning real or personal property offered for sale "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ." (§ 17500.) Both the unfair competition law and the false advertising act contain broad remedial provisions which authorize the courts to correct violations. Sections 17203 and 17535[5] each expressly recognize the authority of the courts to "make such orders or judgments . . . as may be necessary to prevent the use or employment" of deceptive advertising or unfair competition.

While we have found no case directly on point, we believe the authority granted under sections 17203 and 17535 was sufficient to permit the trial court to order the placement of a warning on Alta-Dena's products. The remedial power granted under these sections is extraordinarily broad. Probably because false advertising and unfair business practices can take many forms, the Legislature has given the courts the power to fashion remedies to prevent their "use or employment" in whatever context they may occur. The circumstances surrounding Alta-Dena's false advertising fully support the conclusion that a warning was required, and that the trial court did not abuse its discretion in ordering Alta-Dena to place a warning on its consumer products. Expert witnesses at trial established that, as the result of its long-standing and broad-based advertising campaign, Alta-Dena had created a public perception that its RCM was safe and nutritionally superior to pasteurized milk. The warning statement mandated by the trial court is valid as

---

[5]Section 17203 provides, "Any person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

Section 17535 states, "Any person, corporation, firm, partnership, joint stock company, or any other association or organization which violates or proposes to violate this chapter may be enjoined by any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person, corporation, firm, partnership, joint stock company, or any other association or organization of any practices which violate this chapter, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any practice in this chapter declared to be unlawful.

"Actions for injunction under this section may be prosecuted by the Attorney General or any district attorney, county counsel, city attorney, or city prosecutor in this state in the name of the people of the State of California upon their own complaint or upon the complaint of any board, officer, person, corporation or association or by any person acting for the interests of itself, its members or the general public."

necessary to correct that misperception. As another court has noted in analogous circumstances, "To allow consumers to continue to buy the product on the strength of the impression built up by prior advertising—an impression which is now known to be false—would be unfair and deceptive." (*Warner-Lambert Co.* v. *F. T. C.* (D.C. Cir. 1977) 562 F.2d 749, 761 [183 App.D.C. 230, 46 A.L.R.Fed. 873].)

Furthermore, the court's authority to "prevent the use or employment" of unfair business practices and false advertising necessarily includes the authority to make orders to prevent such activities from occurring in the future. While an injunction against future violations might have some deterrent effect, it is only a partial remedy since it does not correct the consequences of past conduct. (Cf. *Fletcher* v. *Security Pacific National Bank* (1979) 23 Cal.3d 442, 451 [153 Cal.Rptr. 28, 591 P.2d 51].) An "order which commands [a party] only to go and sin no more simply allows every violator a free bite at the apple." (*Warner-Lambert Co.* v. *F. T. C.*, *supra*, 562 F.2d at pp. 761-762, fn. 60, internal quotation marks omitted.) The warning statement mandated by the trial court is necessary to deter Alta-Dena from conducting similar misleading advertising campaigns in the future.

Requiring affirmative disclosure of information as a remedy for consumer deception is not without precedent in California. In *Ford Dealers Assn.* v. *Department of Motor Vehicles* (1982) 32 Cal.3d 347, 363-365 [185 Cal.Rptr. 453, 650 P.2d 328], our Supreme Court upheld regulations adopted by the Department of Motor Vehicles which mandated that prospective buyers be told that automobiles had previously been rented. The federal courts too have approved affirmative disclosures in a variety of contexts. In *Lorain Journal* v. *United States* (1951) 342 U.S. 143, 156 [96 L.Ed. 162, 173, 72 S.Ct. 181], the United States Supreme Court upheld an injunction requiring a newspaper to publicly disclose the terms of a judgment against it by publishing it each week for 25 weeks. In numerous cases brought pursuant to the Federal Trade Commission Act, the federal courts have approved of mandatory disclosures. (See, e.g., *Thompson Medical Co., Inc.* v. *F.T.C.* (D.C. Cir. 1986) 791 F.2d 189, 196-197 [23 App.D.C. 18] [disclosure required on labels and advertising that product did not contain aspirin]; *Grolier Inc.* v. *F.T.C.* (9th Cir. 1983) 699 F.2d 983, 987 [written warning card describing purpose of visit must be given to consumer before all sales presentations]; *Porter & Dietsch, Inc.* v. *F. T. C.* (7th Cir. 1979) 605 F.2d 294, 306-307 [printed warning of health risk for users with certain listed conditions required in future advertisements in addition to warnings already contained on label]; *Warner-Lambert Co.* v. *F. T. C.*, *supra*, 562 F.2d at pp. 760-761 [warning that product does not yield previously advertised health

benefits required in future advertisements]; *Keele Hair & Scalp Specialists, Inc.* v. *F. T. C.* (5th Cir. 1960) 275 F.2d 18, 23 [affirmative disclosure required in future advertisements of what product will not do].)[6]

■ Alta-Dena's primary argument against the court's authority to order the placement of warnings on its consumer products is a constitutional one. Noting that the regulation of businesses in an attempt to safeguard the public health is traditionally a legislative function (see, e.g., *Lewis Food Co.* v. *State of California* (1952) 110 Cal.App.2d 759, 762 [243 P.2d 802]), Alta-Dena argues that, in ordering it to place a warning on its products, the trial court unconstitutionally exercised legislative powers in violation of the separation of powers clause in the California Constitution.[7] This argument misperceives the extent to which the judicial branch is limited by the constitutional separation of powers. "The purpose of the doctrine is to prevent one branch of government from exercising the *complete* power constitutionally vested in another [citation]; it is not intended to prohibit one branch from taking action properly within its sphere that has the *incidental* effect of duplicating a function or procedure delegated to another branch." (*Younger* v. *Superior Court* (1978) 21 Cal.3d 102, 117 [145 Cal.Rptr. 674, 577 P.2d 1014], italics in original.)

Applying this distinction, the court in *Younger* v. *Superior Court, supra,* 21 Cal.3d 102, held that a provision of the Health and Safety Code, which mandated the destruction of criminal records, did not infringe upon the executive power of clemency. Noting that the section was not enacted as an act of grace, but as a means of implementing the legislative objective of reducing the adverse effects of convictions, the court held any infringement on the executive powers was purely incidental to the main purpose of the

---

[6]Alta-Dena maintains that cases decided under the Federal Trade Commission Act do not provide authority for the California courts to mandate the placement of warnings on consumer products because they arose under different circumstances. In those cases, an expert body—the Federal Trade Commission—determined disclosure was necessary; and the function of the courts was merely to decide whether the commission's order was justified. Here, by contrast, it was the court which took evidence and determined the placement of a warning was necessary.

The distinction Alta-Dena draws is valid but not germane to our decision. We do not interpret the Federal Trade Commission Act or cases decided under it as providing direct authority for the courts to mandate the placement of a warning. Rather, we conclude the courts of this state have been provided with that authority under the broad wording of sections 17203 and 17535. Cases decided under the Federal Trade Commission Act are persuasive only to the extent they show how a body given the power to enforce consumer protection laws has discharged that duty.

[7]Article III, section 3 of the California Constitution provides, "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

statute and, thus, was permissible. (*Id.* at p. 118.) Similarly, in *Way* v. *Superior Court* (1977) 74 Cal.App.3d 165 [141 Cal.Rptr. 383], a section of the Penal Code which provided for the retroactive application of the determinate sentencing law was challenged as an unconstitutional infringement upon the Governor's power of commutation. The court rejected the argument, reasoning that the intent of the section was not to commute existing sentences, but to bring them into line with sentences under the new law. Since the shortening of certain prison terms was incidental to the main legislative purpose, it did not violate the constitutional separation of powers. (*Id.* at pp. 177-178.)

Here, the primary purpose of the unfair competition law and the false advertising act is to protect the public from unscrupulous business practices. The mere fact that in carrying out this function, as for example by mandating the placement of a warning on a consumer product, a court may incidentally duplicate a legislative function does not result in a violation of the separation of powers doctrine.

■ Alta-Dena's alternate arguments against the trial court's authority to mandate the placement of a warning on its products are no more persuasive. It maintains that the sole authority granted by sections 17203 and 17535 was the power to grant prohibitory injunctions and, thus, that an order directing it to place warnings on products sold in the future was not authorized. This is clearly incorrect. Both sections authorize the courts to "restore to any person in interest any money or property . . . which may have been acquired," effectively granting broad restitutionary powers. Moreover, sections 17203 and 17535 both give the courts the authority to "make such orders or judgments . . . as may be necessary to prevent the use or employment" of deceptive advertising or unfair competition. As we have noted above, the power to prevent the use or employment of false advertising and unfair business practices necessarily includes the power to correct false impressions built up by prior advertising, and the power to deter future violations. (See *Warner-Lambert Co.* v. *F. T. C., supra,* 562 F.2d at p. 761; *Fletcher* v. *Security Pacific National Bank, supra,* 23 Cal.3d at p. 451.) One way to accomplish these goals is to order a violator to take affirmative action. An order mandating the placement of a warning on products sold in the future is well within the meaning and intent of the statutes.[8]

■ Alta-Dena also argues it is unfair to require it to place a warning label on its RCM because other persons and entities which sell similar

---

[8]Alta-Dena's argument, that the courts are limited to issuing prohibitory injunctions under sections 17203 and 17535, is further undercut by the legislative history of both statutes.

Section 17203 was derived from former Civil Code section 3369, which itself was the subject of extensive revision over the years. Prior to 1976, the courts' remedial powers under Civil Code section 3369 were limited to issuing injunctions. (See Stats. 1974, ch. 746, § 1,

products will not be required to comply.[9] However, there is no evidence that other producers of RCM engaged in false and deceptive advertising as did Alta-Dena; thus, there is no need for such a warning. In any event, absent charges of invidious discrimination, prosecutors have broad discretion to choose which defendants to prosecute and in what order. (*People* v. *Superior Court (Lyons Buick-Opel-GMC, Inc.)* (1977) 70 Cal.App.3d 341, 344 [138 Cal.Rptr. 791].) Alta-Dena has produced no evidence of invidious discrimination, and we discern no abuse of discretion.

■ Finally, Alta-Dena maintains Consumers's action was improper because Consumers failed to exhaust its administrative remedies prior to filing suit by asking the California Department of Health Services to mandate the placement of a warning on all raw milk and raw milk products. However, Alta-Dena failed to raise this argument in the court below and, thus, has waived the right to have it considered on appeal. (*Green* v. *City of Oceanside* (1987) 194 Cal.App.3d 212, 219-223 [239 Cal.Rptr. 470]; see also *Wallis* v. *Farmers Group, Inc.* (1990) 220 Cal.App.3d 718, 735 [269 Cal.Rptr. 299]; *Sacramento County Deputy Sheriffs' Assn.* v. *County of Sacramento* (1990) 220 Cal.App.3d 280, 286 [269 Cal.Rptr. 6].) Indeed, since Alta-Dena first raised this argument in its reply brief, it has doubly waived the right to have it considered on appeal. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 496, pp. 484-485.)

B.-I.*

. . . . . . . . . . . . . . . . . . . . . . .

III. Disposition

The judgment is affirmed.

---

p. 1654.) The statute was then broadened, and the courts were given the additional power to make such orders as were necessary to prevent the use of any practice which constituted unfair competition. (See Stats. 1976, ch. 1005, § 1, pp. 2378-2379.)

Section 17535 underwent a similar evolution as, prior to 1972, the courts were limited to enjoining false advertising. (See Stats. 1941, ch. 63, § 1, p. 729.) An amendment subsequently authorized the courts to make such orders as were necessary to prevent the use or employment of false advertising. (Stats. 1972, ch. 244, § 1, p. 494.)

[9]We note that, subsequent to the trial of this case, the California Department of Health Services issued a regulation mandating the placement of a warning on raw milk and raw milk products which is very similar to that ordered by the trial court. (See Cal. Code Regs., tit. 17, § 11380.)

*See footnote, *ante*, page 963.

We remand to the trial court so it may determine the amount of attorney fees to which Consumers is entitled as the result of its efforts on appeal. (See *Serrano* v. *Unruh* (1982) 32 Cal.3d 621, 637-639 [186 Cal.Rptr. 754, 652 P.2d 985].)

Costs are awarded to respondents.

Smith, Acting P. J., and Benson, J., concurred.

A petition for a rehearing was denied April 13, 1992, and appellants' petition for review by the Supreme Court was denied June 25, 1992.